Filed 3/2/16  In re J.E. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re J.E., et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  J.E.,  Defendant and Appellant. | E063875  (Super.Ct.Nos. J244564, J244565 & J244566)  OPINION |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Kristina M. Robb, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant J.E. (Mother) appeals from the juvenile court's order terminating her parental rights as to her three-year-old son J.E., five-year-old daughter D.L.E., and six-year-old son I.E. On appeal, Mother argues the juvenile court erred in failing to find the beneficial parental relationship exception to termination of parental rights applied. We find no error and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND[1]

The family came to the attention of the San Bernardino County Department of Children and Family Services (CFS) in February 2012 after Mother, who was then almost 22 years old, tested positive for amphetamines when she gave birth to J.E. Mother had admitted to using alcohol and methamphetamine during the pregnancy and not having prenatal care or provisions for the baby.

The social worker had attempted several times to contact the family by visiting the home and sending a certified letter. The social worker did not make contact with Mother until April 4, 2012, at the maternal grandparents' home. The home was found to be filthy and cluttered. Mother and her three children, then two-year-old I.E., one year-old D.L.E., and three month-old J.E., shared a queen-sized mattress located on the floor in the middle of a room.

---

[1] Unless otherwise indicated, the factual and procedural background preceding the Welfare and Institutions Code section 366.26 hearing is taken from this court's nonpublished opinion in Mother's prior writ appeal (*J.E. v. Superior Court of San Bernardino County* (Feb. 11, 2015, E062133) [nonpub. opn.], (*J.E.*)).

Mother reported that the father of her eldest child is J. She did not know J.'s last name or whereabouts. She had met J. in Las Vegas when she was 17 years old. Mother also reported that the father of her two younger children is I.L. I.L. was 19 years old and lived locally, but Mother was no longer in a relationship with I.L.[2] Mother also disclosed that she began using methamphetamine when she was 15 years old and had used it on and off for a few years. She had stopped using methamphetamine when she had her first child and started again after the second child was born.

On April 16, 2012, Mother agreed to submit to a drug test. However, on April 24, 2012, CFS received notice that Mother was a "no show." CFS recommended that Mother participate in Voluntary Family Maintenance Services consisting of an outpatient drug program, random drug testing, and a parenting class. Mother, however, continued to be a no-show for drug testing; and on May 24, 2012, Mother informed the social worker that although she had not used methamphetamine since the baby's birth, she had smoked marijuana almost every night. The social worker offered Mother a chance to participate in a meeting with CFS, but Mother failed to appear at the scheduled meeting.

When the social worker made an unannounced visit to Mother's home on May 30, 2012, then three-year-old I.E. opened the door and told the social worker that Mother was sleeping. Mother awoke and appeared to be under the influence. She reported that she and her sisters had " 'partied hard' " the night before.

---

[2] Neither father is a party to this appeal.

On June 5, 2012, the children were taken into protective custody and placed in foster care. At the time of the children's removal, the children's faces, hair, and clothing were very dirty. They smelled like urine, had a bad body odor and dirt caked under their arms, feet and face. D.L.E.'s clothes and shoes were too small and J.E. had yellowish fluid coming from his noise and his breathing sounded irregular.

On June 7, 2012, petitions pursuant to Welfare and Institutions Code[3] section 300, subdivision (b), were filed on behalf of the children. The children were formally detained the following day and eventually placed with their maternal aunt on July 12, 2012.

At the August 8, 2012 jurisdictional/dispositional hearing, the juvenile court sustained the dependency petitions and declared the children dependents of the court. Mother was provided with reunification services and ordered to participate. Some of the objectives of her case plan were to remain sober, live free from alcohol and drugs, and avoid arrest and conviction.

Mother initially failed to participate in her court-ordered services. She refused to submit to random drug testing or acknowledge that she had a substance abuse problem. She was also uncooperative and would not abide by the visitation schedule. However, by October 2012, Mother admitted that she could not control her drug problem and asked to go into a residential drug treatment program. Mother entered a 90-day residential treatment program on October 26, 2012, and began to make good progress in her case

---

[3] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

plan. She agreed to continue in an outpatient drug program when she completed her inpatient program, demonstrated appropriate parenting skills, and accepted that she had a drug problem.

Due to Mother's progress, at the February 7, 2013 six-month review hearing, the juvenile court continued Mother's services and set a 12-month review hearing.

On May 16, 2013, in light of Mother's continued progress and maintenance of sobriety, the court granted her overnight unsupervised visits. On July 19, 2013, the court granted Mother extended visits from July 26, 2013, to August 9, 2013.

Mother was very appropriate with the children during visits. She spent some overnight visits with the children at the maternal aunt's home which allowed her to develop a strong bond with them.

By the 12-month review hearing, Mother was cooperative and continued to participate in her case plan. She had graduated from her 90-day inpatient residential drug treatment program, had enrolled in an outpatient drug treatment program, and had continued to test negative for drugs. Mother had also completed a parenting program and general counseling. She had moved in with the maternal aunt; however, the maternal aunt had moved to another home to allow Mother to move in with her children. Mother was still unemployed and was searching for employment. She was to apply for cash-aid and would receive Wraparound and Screening, Assessment, Referral and Treatment (SART) services. The children were developing well, and had adjusted well to living

with their maternal aunt. They were bonded to the maternal aunt and were thriving in the structured environment.

At the August 9, 2013 12-month review hearing, the court ordered the children returned to Mother's care on family maintenance. The court approved Mother's family maintenance plan and ordered Mother to participate in family maintenance services. The court authorized the social worker to dismiss the matter by approval packet. Several of the objectives of her family maintenance services were to remain sober, live free from alcohol and illegal drugs, and avoid arrest and conviction.

At some point, Mother and the children moved in with the children's father I.L. to try and establish a family. However, sadly, I.L. was hit by a car and died on September 14, 2013. Mother returned to living with her relatives, and continued to be cooperative with CFS and participate in her services. She tested negative for drugs, attended Alcoholic Anonymous (AA)/Narcotics Anonymous (NA) meetings, and provided a stable home for the children.

However, Mother began to relapse. At the semi-annual review hearing on February 7, 2014, CFS requested a continuance because Mother had failed to show for drug testing and wanted to ensure the drug test was negative. Minors' counsel also noted that during a home visit to Mother's home, there was inappropriate bedding for the children, and requested a continuance to follow up with Mother in regards to a crib for the baby and appropriate bedding for the two older children. The court granted a six-week continuance and ordered Mother to comply with the family maintenance plan and

6

to drug test as directed. The court authorized CFS to dismiss the case by approval packet before the next hearing if appropriate.

Mother had initially been doing well and cooperating with her family maintenance services. However, she had a hard time coping with the death of I.L., and began making wrong decisions. On February 13, 2014, Mother asked for outpatient services but failed to follow through and complete the program. She had five negative drug tests and two positive tests for marijuana. She was terminated from her outpatient drug treatment program on July 3, 2014. In addition, Mother had been arrested three times since the February 7, 2013 review hearing. She was arrested on May 1, 2013, for resisting a police officer, and subsequently placed on probation; on June 2, 2014, for disorderly conduct for being under the influence of alcohol/drugs; and, in September 2014, for alcohol. Moreover, CFS had received two referrals of physical abuse to I.E. during the last six months. The allegations were unfounded, but Mother did not have appropriate caretakers for the children. Mother had obtained her own apartment, but appeared to be overwhelmed as she had relied on relatives for help. Mother had failed to keep her appointments with Wraparound services, and had refused Therapeutic Behavioral Services for I.E. despite the then-five-year-old child digressing to having behavioral problems. I.E. had temper tantrums when he was away from Mother and had made comments about going back to foster care.

Mother had also failed to maintain regular contact with CFS. When Mother moved into her own apartment, she failed to provide the new address to CFS, and the

7

social worker had to look for Mother at a relative's home and at Mother's place of work. When asked why she did not attend her meetings and provide her current address, Mother claimed that she forgot to call or attend. Consequently, the social worker had concerns about Mother's ability to provide a safe environment for the children and believed Mother required further supervision and support from CFS.

At a semi-annual review hearing on August 7, 2014, counsel for CFS advised the court that if Mother continued with her lack of cooperation, CFS was considering removing the children. Minors' counsel asked the court to set the matter contested and, if necessary, counsel would file a section 388 petition to change or modify the court's previous order. Mother indicated that she was willing to participate in the services and cooperate with CFS. She also agreed to drug test that day. The court ordered Mother to participate in her services and also to drug test that day. The court continued the hearing for three weeks and authorized the social worker to remove the children from Mother's care if Mother did not participate and cooperate with CFS.

On August 27, 2014, CFS informed the court that Mother had failed to abide by the court's order to participate in her services. Mother had agreed to stop by the Wraparound office following the August 7, 2014 hearing, but failed to do so. She was advised that CFS had filed a referral for outpatient services and that Mother needed to make an appointment. She, however, missed two intake appointments and did not go until August 21, 2014. She had also failed to enroll I.E. in kindergarten prior to the August 14, 2014 school start date even though she had all summer to obtain the necessary

8

documents and enroll him. She eventually enrolled I.E. in school on August 22, 2014.

Mother also missed two Wraparound meetings on August 13 and 18, 2014, and failed to

bring D.L.E.'s documents as requested on August 19, 2014. Mother also did not

participate in her outpatient substance abuse sessions; however, she had tested negative

for drugs and alcohol on August 21, 2014, and had attended the 12-step/self-help support

meetings. CFS noted that Mother had shown little progress during the last three weeks

and was concerned about maintaining the children in Mother's home.

On August 28, 2014, minors' counsel filed a section 388 petition, requesting

removal of the children from Mother's care and custody.

At a hearing held on August 28, 2014, the juvenile court found removal of the

children was appropriate and requested CFS to file a section 387 petition on behalf of the

children. Minors' counsel thereafter withdrew the section 388 petition. The court

ordered the children to be removed from Mother's custody that day and ordered Mother

to cooperate with the removal.

Mother did not cooperate with the children's removal. CFS had gone to I.E.'s

elementary school, but the maternal grandmother had already taken him out of school that

morning. CFS called Mother at noon asking her to bring the children to CFS's office to

avoid law enforcement involvement. Mother agreed to bring the children to the office at

1:30 p.m. At 1:45 p.m., CFS contacted Mother, and Mother stated that she told the other

social worker that she would bring the children at 3:00 p.m. Mother was told to have the

children at the office in 20 minutes or law enforcement would be contacted. Mother

9

arrived at 2:00 p.m. without the children's belongings and with the maternal aunt, who was telling the children that "it was not their fault" and that CFS had "something against their mother."

On August 29, 2014, petitions pursuant to sections 342 (subsequent) and 387 (supplemental) were filed on behalf of the children.

The children were formally detained on September 2, 2014.

CFS recommended that the allegations in the petitions be found true and that Mother be denied reunification services. The social worker noted that during the first six months the children were returned to Mother, Mother was complying with her services and able to provide the children with appropriate housing. However, after the children's father died, Mother's behavior descended. The social worker had requested Mother to go to the Department of Behavioral Health (DBH) to be treated for depression, but Mother failed to make an appointment despite her repeated promises to do so. She then began testing positive for marijuana and stated that she had a medical marijuana card to combat her depression. After the social worker informed Mother that having a marijuana card in lieu of counseling was indicative of inappropriate parenting skills, Mother agreed to stop smoking marijuana and cooperate with Wraparound services. Nonetheless, Mother continued to test positive for marijuana and failed to cooperate with Wraparound services. Mother subsequently ceased using marijuana but substituted that substance for alcohol. Mother had tested positive for alcohol on September 4, 2014, and had been arrested in May 2014 for resisting arrest and in June 2014 for disorderly conduct due to

10

being under the influence of alcohol/drugs. Mother failed to appear at her arraignment on August 28, 2014, for the criminal charges, had a warrant for her arrest, and was considered a fugitive by the criminal court.

A contested jurisdictional/dispositional hearing on the sections 342 and 387 petitions was held on October 16, 2014. Following Mother's testimony and arguments from counsel, the court found the allegations in the petitions true and removed the children from Mother's custody. The court noted that in "the big scheme of things" Mother's recent infractions and behaviors were "minor," but that they could not be looked at separately. The court explained that the children were removed in 2012; that Mother had engaged in services for over a year; that the children were returned to Mother in August 2013; and since their return, Mother had failed to respond to efforts by the social worker and Wraparound services and instead began using marijuana and alcohol and getting arrested. The court acknowledged Mother's unfortunate circumstances with the death of the children's father, but noted that "when you have three children," Mother could not use that death as an excuse. The court further noted that Mother was not asking for a second chance, but a fourth chance. The court denied Mother's request for further reunification services and set a section 366.26 hearing.

On October 20, 2014, Mother filed a notice of intent to file a writ petition. This court denied Mother's writ petition in a nonpublished opinion. (*J.E., supra*, E062133.)

On February 10, 2015, CFS informed the court a continuance of the section 366.26 hearing was required to find a concurrent home for the children. CFS also noted that it

11

was appropriate to reduce visits to once a month as the children were having difficulty understanding why they were not returning home to Mother which was causing behavioral issues with their current foster home.

The social worker recommended that parental rights be terminated and adoption selected as the permanent plan for the children. The children were all of young ages (5, 4, and 3); healthy; meeting their developmental milestones; well nourished; and engaging in age appropriate play with each other and their peers. The social worker noted the children had a normal bond with their mother and should be able to develop a similar bond with adoptive parents. I.E. appeared to have some emotional concerns understanding why he was removed from his mother and was receiving one-on-one therapy through Wraparound services. Neither D.L.E. nor J.E. showed any emotional or mental concerns.

Since their removal from Mother in August 2014, the children had been in four placements. The first two placement changes were due to the foster homes' inability to keep the siblings together. The last placement change was due to the foster mother leaving the country. The children were currently placed with caregivers who were providing good care for the children and who were willing to provide that care until an adoptive home was located. The children were described as adoptable due to their young ages and the availability of suitable caregivers willing to provide a permanent home for a sibling set of their ages.

12

Mother continued to visit the children once a week for two hours. The visits did not appear detrimental and Mother was appropriate during the visits. Mother brought snacks and gifts for the children and tried to spend quality time with each child. At times, Mother had difficulty maintaining the children's behaviors when they would start fighting with each other.

On April 9, 2015, Mother filed a section 388 petition seeking placement of the children with her. The petition was denied on April 9, 2015.

The contested section 366.26 hearing was held on May 8, 2015. At that time, Mother testified, in relevant part, that the children loved when she arrived at visits; that during visits, they would color, draw, read, and talk; that the children were excited to see her and they would run to her; that the first visits after removal were difficult because the children cried at the end of the visits; and that the children all told her that they wanted to come home. Mother claimed I.E. was very confused and blamed himself. I.E. would tell Mother during visits that he was being better and trying harder so he could come home. Mother believed that it would be beneficial for the children to continue their relationship with her because of all the emotions they had been through, all the love she gives them, and everything the family used to do together. Mother also said that the children had a strong bond with her. As to I.E., Mother knew he had a bond with her because he talked to her about everything, let her know how he felt, they drew together, played games together, and did a lot of things together. Regarding D.L.E., Mother asserted that she and D.L.E. would sing together, play with dolls, and have tea parties. Mother felt that D.L.E.

13

needed her and was comfortable with her, and that J.E. showed his bond by running to her, letting her hold him, and playing with her. Mother further stated that the children called her "mom," and D.L.E. referred to her foster mother as " 'Mommy Grace.' " Mother acknowledged that the children needed stability; that they had been removed twice from her care in their short lifetime; and that being removed twice was not a stable environment.

Following argument, the court found Mother met the first prong for the beneficial parental bond exception in that she had maintained regular contact with the children, but found Mother failed to demonstrate her relationship with the children benefitted the children or that maintaining the parent-child relationship outweighed the benefits of permanency or adoption. The court acknowledged that the children enjoyed seeing their mother and that there was some incidental benefit to the children in seeing her; however, the court did not believe Mother had occupied a parental role for a significant amount of time. The court concluded the beneficial parent-child relationship exception did not apply, found the children were adoptable, and terminated parental rights. This appeal followed.

II

DISCUSSION

Mother contends the juvenile court erred in finding the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(A), did not apply to preclude the termination of parental rights *as to I.E.* In passing, she challenges the termination of

14

her parental rights as to D.L.E. and J.E., based on a determination that the beneficial relationship exception precluded termination of her rights to I.E.[4]

After reunification services are denied or terminated, " 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) A hearing under section 366.26 is held to design and implement a permanent plan for the child. At a section 366.26 hearing, the court must terminate parental rights and order the child placed for adoption if it determines, under the clear and convincing standard, that it is likely the child will be adopted. (§ 366.26, subd. (c)(1).) " 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53; see § 366.26, subd. (c)(1).) " 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' " (*In re Celine R.*, *supra*, at p. 53.) A statutory exception to the general rule requiring the court to choose adoption exists where "[t]he court finds a *compelling* reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B), italics added) because "[t]he parents have maintained regular visitation and contact with the child and

---

[4] Specifically, she claims because I.E. was not adoptable due to the application of the beneficial parent-child relationship exception, neither were his siblings as they were part of a sibling set. Because we reject Mother's contention the beneficial parent-child relationship exception applied to preclude adoption as to I.E. as well as his siblings, we need not address this contention.

the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i); see *In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)

Here, the juvenile court found, and the record reflects, Mother maintained regular visitation with the children. CFS does not contend otherwise. We thus focus on the issue of whether the children would benefit from continuing their relationship with Mother.

In deciding whether the parent-child beneficial relationship exception applies, "the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid*.) The parent-child relationship must "promote[] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Ibid*.)

The parent-child relationship "exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) "[A] child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but does not meet the

16

child's need for a parent." (*Id.* at p. 1350.) Even a "loving and happy relationship" with a parent does not necessarily establish the statutory exception. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.)

"The *Autumn H.* standard reflects the legislative intent that adoption should be ordered unless exceptional circumstances exist, one of those exceptional circumstances being the existence of such a strong and beneficial parent-child relationship that terminating parental rights would be detrimental to the child and outweighs the child's need for a stable and permanent home that would come with adoption." (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) "[T]he *Autumn H.* language, while setting the hurdle high, does not set an impossible standard nor mandate day-to-day contact." (*Ibid.*) "Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." (*Ibid.*) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350; see *In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)

A parent claiming the applicability of the parent-child relationship exception has the burden of proof. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315; *In re C.B.* (2010) 190 Cal.App.4th 102, 133-134; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 574.) The parent must show both that a beneficial parental relationship exists and that severing

17

that relationship would result in great harm to the child. (*In re Bailey J.*, *supra*, at pp. 1314-1315.) A juvenile court's finding that the beneficial parental relationship exception does not apply is reviewed in part under the substantial evidence standard and in part for abuse of discretion. The factual finding, i.e., whether a beneficial parental relationship exists, is reviewed for substantial evidence, while the court's determination that the relationship does or does not constitute a "compelling reason" (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53) for finding that termination of parental rights would be detrimental is reviewed for abuse of discretion. (*In re Bailey J.*, *supra*, at pp. 1314-1315; accord, *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) A juvenile court's ruling on whether there is a "compelling reason" is reviewed for abuse of discretion because the court must "determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and . . . weigh that against the benefit to the child of adoption." (*In re Bailey J.*, *supra*, at p. 1315, italics omitted.)

Mother argues she met her burden to show the relationship she shared with I.E. was so strong that it provided a compelling reason to prevent termination of parental rights. In support, she claims that she "never harmed" the child physically or emotionally and therefore his primary bonded connection with Mother was "not marred or undermined by any psychic or social dysfunction."[5] She further asserts her bond with

_____

[5] Mother's claim that she never harmed the child is belied by the record. From the outset, it was clear Mother's substance abuse issues resulted in neglect of all three children. Prior to removal, when the social worker made an unannounced visit to Mother's home, I.E., age three at the time, opened the front door and stated his mother was sleeping. After Mother awoke, she stated that she and her sisters had " 'partied

*[footnote continued on next page]*

18

I.E. was strong as he had lived with her most of his life, 56 months out of 71 months, and she had maintained her bond with I.E. through visitation. She also points to I.E.'s "mental anguish" including emotional disturbance he exhibited in trying to understand why he was removed from Mother, believing the inclusion of such a disturbance in the section 366.26 report meant it was significant, and I.E.'s behavioral issues. She further notes I.E. had blamed himself for his separation from Mother to support her claim I.E. suffered emotionally. Finally, Mother notes that at the time of the section 366.26 hearing no adoptive home had been found for the children.[6]

However, none of the claims raised by Mother overcome the deference given to the juvenile court finding the exception did not apply. Even if Mother had established the existence of a beneficial parental relationship, she cannot show the juvenile court abused its discretion in regard to the second component of the beneficial parental relationship exception. The ultimate question we must decide is whether the juvenile court abused its discretion by failing to find that termination of parental rights would be so detrimental to the children as to overcome the strong legislative preference for adoption. That decision is entrusted to the sound discretion of the juvenile court. (*In re Bailey J.*, *supra*, 189

*[footnote continued from previous page]*
*[footnote continued from previous page]*
hard' " the night before. In addition, at the time of removal, the children were in disarray, smelled of urine, had a bad body odor, and dirt caked under their arms, feet and face. Mother's substance abuse clearly showed she harmed the children by her neglect.

[6] We note the presence or absence of a proposed adoptive family is only one factor to be considered by the court in determining whether a child is adoptable. (*In re David H.* (1995) 33 Cal.App.4th 368, 378.)

19

Cal.App.4th at pp. 1314-1315.) We cannot find an abuse of discretion unless the juvenile court exceeded the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) " 'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*Id.* at p. 319.)

There is no evidence to show I.E. and his siblings had a "substantial, positive emotional attachment" to Mother. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; see *In re S.B.* (2008) 164 Cal.App.4th 289, 299.) I.E., who was born in June 2009, was initially removed from Mother's custody on June 5, 2012. I.E. was out of Mother's care for 14 months before he was returned to Mother on August 9, 2013. The children were subsequently removed from Mother's care on August 28, 2014, after being in Mother's care for just over one year. The section 366.26 hearing occurred about eight months later on May 8, 2015. Thus, I.E., who was merely five years old at the time of the section 366.26 hearing, was out of Mother's care for almost two years of his young life. And, D.L.E. and J.E. had resided out of Mother's care for most of their young lives. Although Mother had visited the children, showed her commitment and love to the children, and the visits went well, the evidence regarding Mother's visitation in no way showed that she occupied a parental role in the children's lives. Rather, Mother's interactions with the children appeared to be more akin to a friendly visitor or non-parent relative, such as an aunt. It does not appear the children were particularly upset when the visitation sessions ended, or that they were particularly anxious to visit Mother.

20

Mother did not introduce any evidence showing the children would be greatly harmed by the termination of her parental rights. Mother points to I.E.'s "emotional disturbance," but the record shows that it was *Mother's actions* in creating a highly unstable home life that resulted in I.E.'s emotional and behavioral problems. After his initial removal, I.E. was noted as having difficulty following the rules, but after the caretaker applied appropriate discipline, his behavior improved. I.E.'s behavior again digressed once Mother was granted unsupervised visits. I.E. was then assessed by mental health staff to address his defiant behaviors and was scheduled to begin counseling. However, after the children were returned to Mother's care, Mother failed to keep his Wraparound appointments and refused additional services for I.E. The social worker was concerned that I.E.'s lack of participation in services caused his behaviors to decline. Mother's failure to ensure I.E. was receiving his required services, *while in her care*, led to a decline in his behavior. Thus, Mother's assertion that I.E.'s behavioral problems were the result of his removal from her care is without support. The record shows that I.E.'s behavioral problems stemmed from Mother's inability to provide a stable home for I.E. and her failure to acquire necessary services for him.

There was no evidence whatsoever that the children would suffer great detriment if parental rights were terminated. Consequently, the juvenile court could reasonably conclude that termination of Mother's parental rights would have no detrimental impact on the children. While there is evidence supporting a finding of a positive relationship between Mother and the children, especially I.E., there is also evidence supporting a

reasonable conclusion that the children would gain a greater benefit from being placed in a permanent adoptive home. There must be evidence that the relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents" and that severance of the relationship "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Here, there simply is no such evidence.

In sum, the record supports the juvenile court's determination that the beneficial parent-child relationship exception did not apply in this case.

III

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:


HOLLENHORST
J.


McKINSTER
J.


22